# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1090EM

_____

Alexander Garrett,

       Appellant,

       v.

Dave Dormire,

       Appellee.

\* On Appeal from the United
\* States District Court
\* for the Eastern District
\* of Missouri.

_____

Submitted: November 14, 2000
Filed: January 26, 2001

_____

Before McMILLIAN, RICHARD S. ARNOLD, and BOWMAN, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

Alexander Garrett, a Missouri inmate, appeals from the District Court's[1] denial of his petition for a writ of habeas corpus filed under 28 U.S.C. § 2254. He argues that he received constitutionally ineffective assistance of trial counsel due to counsel's

---

[1]The Hon. Jean C. Hamilton, Chief Judge, United States District Court for the Eastern District of Missouri.

failure to interview and call certain witnesses who would have discredited the testimony of one of the State's witnesses, Henry Miller. We affirm.

## I. Trial

Garrett was charged with one count of first-degree murder, one count of first-degree assault, and two counts of armed criminal action, all arising out of the April 14, 1987, fatal shooting of Garrett's girlfriend, Peggy Bracken, and the wounding of his acquaintance, Joe Harris. Mr. Garrett's first trial ended in a hung jury. At his second trial, upon which this habeas action is based, he was found guilty of all four counts and was sentenced as a persistent offender to life imprisonment without the possibility of parole, followed by concurrent sentences of thirty years, three years, and three years.

At the second trial, Mr. Harris testified that Ms. Bracken, who was a friend of his, came to his apartment at about 5:00 a.m. on the day of the crimes and asked him to take her to Mr. Garrett's apartment so that she could retrieve her purse which she had left there. Mr. Harris agreed and after calling Mr. Garrett, who said they could come, drove Ms. Bracken to Mr. Garrett's apartment building. Mr. Harris remained in his parked van while Ms. Bracken entered the two-story building.

Mr. Harris further testified that Ms. Bracken came out about five minutes later and got back into the van, asking Mr. Harris to wait because Mr. Garrett wanted to talk to both of them. A few minutes later, Mr. Garrett came out and stood outside the van near the front passenger's door chatting cordially with Ms. Bracken and Mr. Harris. He then entered the van in the seat directly behind Mr. Harris, and the conversation continued. After several minutes, Mr. Harris said he needed to leave. Mr. Harris testified that he then felt something hit him in the back of the head and heard a lot of loud noise. The next thing he remembered was lying on his stomach on the ground alongside the van with Mr. Garrett standing above him. Mr. Garret then shot him again. Mr. Harris testified that he next regained consciousness at the hospital to which

he was taken for emergency surgery, where he told the police that Mr. Garrett was his assailant. Mr. Harris testified that on a previous occasion he had seen Mr. Garrett with a gun resembling a .38 caliber revolver.

The first police officer to arrive at the scene of the crimes found Mr. Harris lying on the ground unconscious and Ms. Bracken dead, slumped over in the passenger seat of the van. Both had been shot with a .38 caliber revolver. Mr. Garrett and Larry Taylor, who lived in the apartment next to Mr. Garrett's, were rendering aid to Mr. Harris. The murder weapon was never found.

The State also presented the testimony of Henry Miller, who did not testify at the first trial. Mr. Miller had sent a letter to the police dated June 20, 1988, saying that while he was incarcerated at the St. Louis City jail with Mr. Garrett (May 1997 to November 1988), Mr. Garrett confided in him that he had shot Ms. Bracken and Mr. Harris with a .38 revolver. According to Mr. Miller, Mr. Garrett told him that when he was in the van, he argued with Ms. Bracken about $300 of his money she had used on cocaine; that Mr. Harris told him to leave Ms. Bracken alone, at which point Mr. Garrett shot Mr. Harris and then Ms. Bracken; that he got out of the van and shot Mr. Harris again while standing over him; and that he then went back upstairs to his apartment, coming out again a few minutes later.

According to Mr. Miller, Mr. Garrett told him he was not going to plead guilty because the police did not have the murder weapon. Mr. Garrett had told him where he had hidden the gun, but Mr. Miller could not remember where that was.

On cross-examination, defense counsel questioned Mr. Miller about his extensive criminal record, which included rape and murder convictions. She also questioned him about his expectations for a favorable letter to his parole board from the prosecutor in exchange for his testimony, and about why he had waited until June 1988 to come forward with his story that Mr. Garrett confessed to him. She asked him about

an incident at the jail in which Mr. Garrett informed the authorities about what happened in a fight between Mr. Miller and another inmate. Mr. Miller replied that he didn't know anything about that.

Defense counsel also asked Mr. Miller whether he had read a report on Mr. Garrett's case in a newspaper called *The Evening Whirl*. Mr. Miller admitted that he had read such a report but claimed the paper did not report any of the details of the crimes, and that he knew those details from Mr. Garrett's confession to him.

Mr. Taylor testified for the defense that early in the morning of the day in question, he heard what sounded like a car backfiring. Within several seconds, he heard Mr. Garrett's door slam and someone going down the steps from Mr. Garrett's apartment. He then heard Mr. Garrett shout to him from the street to call an ambulance. He told his girlfriend to do so, and he joined Mr. Garrett outside at the scene of the crimes.

Mr. Garrett testified on his own behalf, denying that he committed the crimes. He denied that Ms. Bracken owed him any money. He testified that on the morning of the crimes, he heard a car drive off outside his apartment building. When he looked outside he saw Mr. Harris's van with Ms. Bracken in the passenger seat not moving. He went outside and as he approached the van he heard a voice say, "Help me please," whereupon he saw Mr. Harris lying on the street. Mr. Harris told him that a man named Don (or Sundance) shot him, but that he was going to tell people that Mr. Garrett shot him because Mr. Garrett "set him up." Mr. Garrett called for Mr. Taylor, and called out Ms. Bracken's name, but she did not answer. Soon thereafter, an ambulance and the police arrived.

## II. State Post-conviction Proceedings

Following his conviction and sentence, Mr. Garrett sought state post-conviction relief, arguing, among other things, that trial counsel was ineffective in failing to interview potential witnesses who would have testified that Mr. Miller and Mr. Garrett had a confrontation in jail. Mr. Garrett argued that these potential witnesses would have thereby discredited Mr. Miller's testimony by showing that he had a grudge against Mr. Garrett.

At an evidentiary hearing on his post-conviction motion, Mr. Garrett testified that he never told Mr. Miller he had shot Ms. Bracken and Mr. Harris. He testified that after he had witnessed a fight between Mr. Miller and another inmate at the jail, he sketched pictures of the fight and gave them to a jail guard. Mr. Garrett further testified that because of his drawings, Mr. Miller was put into solitary confinement for his part in the fight, and that when Mr. Miller was released he told Mr. Garrett he would get even with him. Mr. Garrett testified that he gave his trial counsel the names of four other inmates who witnessed these events at the jail. He also suggested to his attorney that Mr. Miller must have known the details of the crimes from *The Evening Whirl,* which he saw Mr. Miller reading in jail.

Trial counsel, an experienced public defender, testified at the hearing that she considered three strategies for discrediting Mr. Miller – by bringing up Mr. Miller's fight with the other inmate, which Mr. Garrett sketched, by showing that Mr. Miller obtained his information about the crimes from *The Evening Whirl*, and by noting that Mr. Miller was jealous of Mr. Garrett's drawing abilities. She did not pursue the first except to the extent already indicated, because she did not see that it had any bearing on the case; the copies of *The Evening Whirl* she obtained did not report the crimes with the detail related by Mr. Miller; and she did not pursue the last avenue because she did not believe the jury would find it credible that Mr. Miller would testify against someone in a homicide case because of jealousy over drawing ability. She also stated

that she felt there was no need to call any inmate witnesses because Mr. Miller "hurt himself in his testimony."

At the court's direction, Mr. Garrett obtained and submitted answers to interrogatories from the four potential inmate witnesses regarding what they would have testified to had they been called to a hearing. Two answered that they heard Mr. Miller say he was going to "get" or "get even with" Mr. Garrett. According to another, Mr. Miller was angry with Mr. Garrett because Mr. Garrett refused to draw him pictures, and Mr. Miller "was a little off in the head." The court found that the testimony, even if given and assumed to be true, "would not have been of such a nature as to change the evidence upon which the jury made its . . . finding."

The state court found that counsel's decision not to interview or call any inmate witnesses was a matter of trial strategy and did not constitute ineffective assistance of counsel, and denied Mr. Garrett's motion for post-conviction relief. The Missouri Court of Appeals affirmed Mr. Garrett's conviction and sentence, as well as the denial of his post-conviction motion. See State v. Garrett, 813 S.W.2d 879 (Mo. App. 1991).

III. Federal Habeas Action

A.

Garrett filed the present action on May 13, 1997, raising five claims, including the claim of ineffective assistance of counsel based on the failure to interview and call as witnesses the inmates who knew about Mr. Miller's animosity toward Mr. Garrett. Reviewing the state courts' decisions under the standard set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), the District Court denied Mr. Garrett's habeas petition. The District Court granted him a certificate of appealability on the ineffective-assistance claim, and this appeal followed.

B.

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate that (1) "counsel's representation fell below an objective standard of reasonableness; and (2) "the deficient performance prejudiced the defense." Id. at 687. Trial counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. There is a strong presumption that counsel's challenged actions or omissions were, under the circumstances, sound trial strategy. Id. at 689; Ervin v. Delo, 194 F.3d 908, 914 (8th Cir. 1999) (defense counsel's choice of means to impeach a witness was reasonable trial strategy), cert. denied, 120 S. Ct. 2731 (2000); Mills v. Armontrout, 926 F.2d 773, 774 (8th Cir. 1991) (decision not to attempt to impeach a prosecution witness was a strategic one).

To satisfy the second part of the Strickland test, the petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

As the District Court noted, the AEDPA governs a federal court's review of a state prisoner's § 2254 habeas petition, as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court unless the adjudication of the claim –

-7-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Furthermore, a state court's findings of fact are entitled to a presumption of correctness. Id. § 2254(e)(1).

C.

Upon review of the entire record, we conclude, as did the District Court, that the state courts' findings of fact on the issue before us were not unreasonable in light of the evidence presented at the post-conviction hearing. The state courts correctly identified Strickland as the controlling legal principle, and did not unreasonably apply the Strickland framework to the facts of this case. Trial counsel's decision on the best way to deal with Mr. Harris's testimony was reasonable trial strategy. In addition, we are not convinced there is a reasonable probability that Mr. Garrett would have been acquitted if defense counsel had presented the testimony of one or more of the potential inmate witnesses.

Accordingly, we affirm.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-8-