**Jeremy Michael ATWOOD, Petitioner,**

v.

**Terry MAPES, Warden, Respondent.**

**No. C03–0034–MWB.**

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

July 19, 2004.

952

Alfredo G. Parrish, Parrish Kruidenier Moss Dunn Montgomery Boles & Gribble, LLP, Des Moines, IA, for Petitioner.

Thomas W. Andrews, Department of Justice, Des Moines, IA, for Respondent.

MEMORANDUM OPINION AND OR-
DER REGARDING MAGIS-
TRATE'S REPORT AND RECOM-
MENDATION ON PETITIONER'S
WRIT OF HABEAS CORPUS

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* .................................................... 953
    A.   *Procedural Background* ......................................... 953
    B.   *Factual Background* ........................................... 954
    C.   *Decisions Below* .............................................. 962
        1.   *Direct Appeal* ............................................ 962
        2.   *Postconviction relief application hearing* ................ 963
        3.   *Appeal of denial of postconviction relief application* ..... 964

II. *LEGAL ANALYSIS* ................................................. 964
    A.   *Standard Of Review* .......................................... 964
        1.   *Standard for review of magistrate's report and recommendation* ........ 964
        2.   *General standards for § 2254 relief* ...................... 965
    B.   *Jury's Exposure To Extrajudicial Material* ................... 965
        1.   *Atwood's objections* ..................................... 965
        2.   *The law* ................................................. 965
        3.   *Judge Zoss's analysis* ................................... 967
        4.   *Application* ............................................. 968
    C.   *Denial Of Right To Be Present During Proceedings* ........... 974
        1.   *Atwood's objections* ..................................... 974
        2.   *The law* ................................................. 975
        3.   *Analysis* ................................................ 977
    D.   *Ineffective Assistance Of Counsel* ........................... 979
        1.   *Standards for ineffective assistance of counsel claims* ... 979
        2.   *Judge Zoss's conclusions* ................................ 980
        3.   *Atwood's objections* ..................................... 980
        4.   *Analysis* ................................................ 981

III. *CERTIFICATE OF APPEALABILITY* ................................. 982

IV. *CONCLUSION* .................................................... 982

"Private communications, possibly prejudicial, between jurors and third persons, ... are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."

*Mattox v. United States*, 146 U.S. 140, 150, 13 S.Ct. 50, 36 L.Ed. 917 (1892).

The crux of this petition for writ of habeas corpus revolves around an anonymous telephone threat received right before closing arguments were set to begin. The threat was that death would befall all participants in the trial unless a specific verdict was reached in the case—exactly what verdict was requested remains uncertain. Key to this inquiry is whether the defendant's constitutional rights to an impartial jury, and to be present during all aspects of the trial, were violated by the trial judge's decision to inform the jury of this threat without counsel or the defendant present. Also at issue is whether the defendant was denied effective assistance of counsel when his trial lawyers neither asked that they and the defendant be present when the jury was informed of the threat, or asked for *voir dire* of the jurors to determine whether the disclosure of the threat had compromised their impartiality.

## I. INTRODUCTION

### A. Procedural Background

On June 12, 1998, petitioner Jeremy Michael Atwood ("Atwood") was convicted of two counts of vehicular homicide in the District Court in and for Linn County, Iowa, by a jury of his peers. Atwood was sentenced to two consecutive indeterminate terms not to exceed ten years in prison.

On May 16, 2003, Atwood filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 4). The petition

was referred to United States Magistrate Judge Paul A. Zoss pursuant to 28 U.S.C. § 636(b)(1)(B). Following the establishment of a briefing schedule on the petition, Atwood filed his brief in support of the issuance of a writ on September 17, 2003 (Doc. No. 8), defendant Terry Mapes ("Mapes") filed his resistance on November 10, 2003 (Doc. No. 10), and Atwood filed his reply brief on December 2, 2003. (Doc. No. 11). On February 25, 2004, Judge Zoss filed his Report and Recommendation which recommended denial of Atwood's petition and issuance of a certificate of appealability. (Doc. No. 14). On March 4, 2004, Atwood filed his objections to the Report and Recommendation. (Doc. No. 15). The court, therefore, must now undertake the necessary review of Judge Zoss's recommended disposition of Atwood's petition for a writ of habeas corpus.

### B. Factual Background

In his Report and Recommendation, Judge Zoss made the following findings of fact:

In a case that received intense media attention before, during, and after the trial, Atwood was charged with striking and killing two children, ages 5 and 13, with his vehicle while they were walking to a neighbor's house to sell candy. The issues Atwood raises in his petition before this court all relate to events that occurred on June 9, 1998, the day on which closing arguments were to begin in the case.

On that morning, the parties and the trial court met to discuss jury instructions. Closing arguments were scheduled to begin at 10:00 a.m. At 10:24 a.m., the court announced to the parties and spectators that a matter had arisen that would postpone closing arguments until 1:00 p.m. At 1:15 p.m., the trial judge made the following record outside the presence of the jury, with Atwood, the parties' attorneys, and spectators present in the courtroom:

THE COURT: The record should reflect that we're present in open court outside the jury's presence. Ladies and gentlemen, closing arguments were delayed this morning because the Court had been made aware that an anonymous call which was threatening in nature had been placed regarding this case.

As a result, I have directed that additional security measures be taken to ensure the safety of the participants in this trial and the public as well. In addition, the circumstances of the call are being investigated by appropriate law enforcement personnel. To preserve the integrity of that investigation, it is not appropriate for the Court to provide additional details regarding the call at this time.

In view of those circumstances, it will be necessary to delay the final arguments in this case until tomorrow morning at ten o'clock. And we will be in recess at this time. And the court attendant will have some further instructions for anyone who is intending to be present at that time. We're in recess until ten o'clock tomorrow morning.

Trial Tr. at 866–87.

Shortly thereafter, the trial judge met in chambers with Atwood, his attorneys Brian Sissel and Tim Ross–Boon, and the prosecutor Harold L. Denton, and the following record was made:

THE COURT: On the record. Show that we're present in the Court's chambers. Mr. Denton appears on behalf of the State. Mr. Ross–Boon and Mr. Sissel are present as well. In addition, Jeremy Atwood, is personally present in chambers also. We're here so that we can make

some record concerning a matter that caused the final arguments in this case to be delayed.

The final argument was scheduled to begin in this case at 10 a.m. this morning. Just a few minutes before—before final arguments were to commence, the Court was made aware that there was an emergency call for Mr. Sissel. As I recall, Mr. Ross–Boon actually took that call for him. And then Mr. Ross–Boon advised the Court that an anonymous call had been placed to the Public Defender's Office and received by Lee Ann Aspelmeier, who is their receptionist.

I'll summarize what she reported. She indicated that between 9:45 and 10 a male called the office and asked if she was listening and advised that he had been paid 50 dollars and instructed by some form of written note to indicate that the participants in this trial, including the prosecutor, perhaps defense counsel, and the jurors, would be killed in the event that a specific verdict were not returned.

And I think it's fair to say that she believes that that was a not guilty verdict, but is not positive about that. She indicated that she was fairly shaken when the call was received and knows that the caller meant to convey that a problem would arise if a specific verdict were returned. But it is not entirely clear which verdict was intended.

As a result of that call, we agreed that final arguments would be rescheduled for one o'clock to provide an opportunity for response by the Court. Law enforcement officers were immediately involved. Miss Aspelmeier was interviewed, and the Court has directed that additional security measures be taken to enhance the safety of the participants in this trial and the public. To this point in

time there really have been absolutely no problems with regard to security during the first six days or so of the trial.

The jury is upstairs in the jury room, and they have not yet been told about the incident. And I wanted to give the parties a chance to say whatever they wished to say on the record about what course the Court should pursue at this time.

I did make a very general statement in open court before we came into [sic] make this record which, essentially, just advised those present in open court that an anonymous caller had made threats in connection with this case this morning and that, as a result, additional security measures would be taken. I indicated that it was not appropriate in view of the investigation to provide additional details and simply rescheduled final arguments in the case until tomorrow morning at ten o'clock.

Counsel, I'll listen to you before making a final decision, but I tend to think that the most reasonable way to proceed here, and perhaps the fairest from the point of view of both the Defendant and the State, would be for the Court to personally make a brief statement to the jury informing them in general terms that the proceedings were delayed because of a threat that was called in. And I don't think it's necessary to provide them with all the specific details, but I think it is appropriate in view of concerns for their safety as well to provide them with general information indicating that there were general threats made to, essentially, all the participants in this case.

I would intend to tell them that I had referred the call for investigation

and taken the actions that I thought were reasonable and appropriate to provide for additional security. And then instruct them that if anyone attempted to have any contact with them regarding the case, they should, as previously instructed, immediately let the Court know about that so that I could take whatever actions were appropriate. And then reconvene and indicate that they would be called upon to hear the case and decide it tomorrow morning at ten o'clock.

It seems to me that it would not be appropriate for me to answer a lot of questions. If they have questions, I probably would just have the reporter note those questions so the State and the Defendant would have an opportunity to be aware of those before I made any kind of a response.

Mr. Denton, do you have any comments regarding the State's position concerning that procedure?

MR. DENTON: Well, I don't see any particular harm in just telling them that. I think that—You know, I think under the circumstances, if we're not going to sequester them or lock them up for the night, there's not much point in giving them much details about it. I mean, I don't see that there's anything in the threat that would indicate there's any real danger to them at this point anyway.

THE COURT: Mr. Sissel and Mr. Ross–Boon.

MR. SISSEL: Well, Judge, we would, first of all, object entirely to the Court instructing or informing the jury that their personal well-being was threatened in this manner. I think what it does is—I think what it does is it takes away from them being able to decide the facts of this case, and it puts undue pressure on them to return a verdict.

And, I mean, it's obvious, given the media in this case, given the amount of people who have been in the courtroom and been there the entire time on the victims' side, that this is a difficult case to begin with. And for them to find out that there's some anonymous person out there who made this call threatening their safety is too burdensome.

And I guess we would at this time—If the Court were still going to forge ahead and make a statement to them, we would make a motion for a mistrial based—based on that. And it's my understanding assuming that—or if the Court denies our motion for a mistrial, my other concern, which we indicated prior to going into the courtroom to announce to the general public, that if—we would at least ask that they be sequestered.

I have a feeling that this is going to be headlines in the newspaper tomorrow; and I might be wrong on that but, certainly, tomorrow will tell. That family members, significant others, whoever get this information that there's been threats made and their safety may be in jeopardy, would have influence on these people. And I just—I just feel by sending them home and putting them in that position it's going to open another can of worms.

So I guess the first thing would be the motion for a mistrial. The second thing is we would ask, if the mistrial is not granted, that they be totally sequestered.

And then I guess from the questionnaire point of view—I mean, I guess my concern, which we have talked about earlier, is the questions that they are going to have and the concern they might have. And if the

Court is going to go up and just note the questions and then come back down and consult, you know, that might rectify that problem. If you're going to make a blanket statement and then take their questions and then we can come down and deal with them, that would probably be the best way to handle that.

THE COURT: Obviously, my intention was to take a court reporter up with me. I don't know if you—

MR. SISSEL: Yeah, that's my understanding.

THE COURT: Anything else, Mr. Denton?

MR. DENTON: Well, Your Honor, obviously, this was an emotional case to begin with. We have all known that since the beginning. And, you know, I think there were concerns about the security to begin with in the courtroom. So I think—To allow an anonymous threat to interfere with this process, I think it creates a situation where, you know, in the future all you got to do is make an anonymous phone call and you can derail the entire proceedings.

So I think—Obviously, we don't want them to be told that, okay, you have got to decide it this way or your lives are in danger. But I don't think that—you know, I don't think we really need to tell them all that much. I think what the Court proposes is reasonable, but I just don't think we need to tell them much at all.

(Pause in proceedings as Defense counsel are conferring off the record.)

MR. SISSEL: You know, I have nothing further to add for the Court.

THE COURT: Well, you know, it's a difficult situation. But, obviously, from the point of view of the State and any defendant in a criminal case, the rule cannot be that any time somebody makes what we all know in most instances is a crank call that the process comes to an end.

I'm willing to remain vigilant to make sure that we have a jury that can decide this case fairly and impartially. But I don't think it's appropriate or in the interests of justice to pull the plug at this time just because we have had an anonymous caller make threats to virtually all the participants involved in the trial.

So I will—My intention is to take a court reporter up and provide the jury with general and brief information about why we're delayed. And I'm going to have them stay for a bit so that we can see whether or not they have any questions, and then also discuss further the issue of whether or not sequestration should be considered or not in this case.

All right. So—Why don't you give me 15 minutes to do that.

Trial Tr. at 867–74.

The trial judge next met with the jury, with only the judge, the jury, and the court reporter present, and the following record was made:

THE COURT: For the benefit of the record, the Court is visiting with our 14 jurors in this case in our jury conference room.

Ladies and gentlemen, I wanted to explain to you why we're delayed. We made wonderful progress the first six days, and we're a day or two ahead of schedule. But what happened this morning was shortly before we were scheduled to begin our closing arguments there was brought to the Court's attention the fact that an anonymous phone call that was threatening in nature and directed to virtually all of the participants in this trial had been placed. And, obviously, that

was something that I then had to deal with.

Unfortunately, this is something that occasionally occurs at the courthouse, not often but once in awhile, and we just have to deal with an issue when it comes up. And I have taken what steps that I think are appropriate. Obviously, involved some law enforcement officers to investigate the circumstances. And, in addition, taken some steps to ensure that we have enhanced security during the course of the trial.

And when we come back tomorrow, I wanted to make you aware that I have got our metal detector, and things like that, that are set up, and I'm going to go ahead and use those. We use those fairly often in connection with cases that occur at the courthouse. And I am going to go ahead and set those up and have those operative tomorrow.

One thing I guess I would like to say is, you know, I know this is something that's new to you, but we occasionally have to go down this road. Obviously, if somebody makes a call, even if we believe it is a crank call, we have to react to it appropriately rather than ignore it, which is what I have tried to do here.

And right now we're scheduled to reconvene with closing arguments commencing tomorrow at ten o'clock. Because this all happened we could not make the arrangements that were necessary to go ahead and start arguing the case this afternoon. So that's where we are at this point in time.

I guess one thing that I would like to tell you by way of reassurance is I have been in this district for 25 years, 12 as a lawyer, and 13 as a judge; and although we get calls of this nature from time to time, I'm aware of no occasion in 25 years that I have been

around here where anybody has ever followed up in connection with a call of this nature. So I did feel, though, that it's appropriate to make you aware of why you have been sitting up here since ten o'clock since we have tried to minimize occasions when that has occurred during the trial.

Now I have not yet excused the parties. They're downstairs, and they're waiting for some instructions from the Court just to confirm that we're starting tomorrow at ten o'clock.

If you had any questions, I had indicated to them that I didn't feel it was appropriate for me to respond without reviewing a question that a juror may have had. But if there was anything that you thought you needed to ask the Court at this time, I can make a note of that; and if I can respond, I will. And if it's not something that's appropriate for me to respond to, I hope you would understand that that's the case.

And before we excuse you this afternoon, I do need to double-check with the parties. But anything that anybody wanted to take up with the Court?

(There was no response by any jury member.)

THE COURT: Well, I appreciate very much your patience. Obviously, this is something that was not what I would have planned for your morning this morning, or mine neither [sic] for that matter. But I've done what I believe it was necessary for me to do, and I'm trying to get all our "ducks in a row" so that we can get this case concluded. So bear with me, I should be able to tell you maybe within 15 minutes or so whether or not you can go on home, and we can get this case

to the jury tomorrow morning hopefully.

Okay. All right. Thanks for your patience, jurors.

Trial Tr. at 874–77.

The judge then returned to chambers to meet with Atwood and the parties' attorneys. The court reporter read back the record that had been made when the judge met with the jurors, after which defense counsel left the room and conferred for about five minutes. When defense counsel returned to the room, the following record was made:

MR. SISSEL: I guess, Judge, we would—we would like to make a brief record. Obviously, we were opposed to the jury having any knowledge of this—this information and—to begin with, putting them in a position of having threats against their life or their safety. And I think now that this has been done, it's tarnished, spoiled the jury panel.

You know, they're going to see all the extra security, knowing about the metal detectors being involved. It tells you, obviously, someone—the potential of someone carrying in a weapon of some sort, or at least trying to—the security trying to—to avoid that happening. I think that this is going to put undue pressure on them.

I know that before the Judge—before the Court went up to talk with the jurors I think we all kind of agreed that there was going to be a statement read and then leave an open forum. My understanding of reading the thing that the jury didn't respond, or didn't have any questions regarding that. I think—And whether that's our fault for not being present in the situation, was unable to see the reactions, the demeanor to the jury members when this was told to them, you know, I kind of think it puts—

And this Court has—has put itself in a position where—potentially becoming a witness in this thing because we don't know if—I mean, there's a statement in there that they could—have to sit around—if they have any questions, they have to sit around until we can answer them, if the Court wasn't on its own being able to answer the questions for them.

They have been sitting there since—well, at least ten o'clock this morning, and it's now 2:30ish. You know, I don't know what's going through their minds. And it's my understanding the Court is going to release them to go home without any further sequestration. We've addressed the media. We have addressed the public.

This is, obviously, going to be something that is going to be of utmost concern to these people. And I think that by submitting this case to this, jury it's going to—it's going to unfairly prejudice Mr. Atwood.

I think the jury is going to have in the back of their mind, obviously, let's get this thing over with, let's get this guilty verdict on file, and get out of here. I know there's no indication as to what the threats were or any other indication as to whether there was any coercion one way or another about a verdict.

But, you know, I just think in a criminal case, and especially in a situation like this, it's—it's obvious that that's what—that's what is expected out of these people is a guilty verdict. And I think at this point we have—we have spoiled this jury to the point where any admonitions, any further acknowledgment of the threats, any

further questioning of this jury is going to do nothing more than put them in a very pressured situation in which they're not going to be able to decide this case based solely on the evidence.

And there's going to be outside factors. And I just don't think that is going to allow Mr. Atwood a fair trial at this particular moment.

THE COURT: Mr. Denton.

MR. DENTON: Your Honor, I believe that the record so far supports the fact that the jury should be able to decide this case on the merits. The additional security precautions are something that, if we had received a threat, I think we would all agree we would want to put those into place.

We have discussed this case before that perhaps we ought to have had those anyway. Now, actually, the conduct of the parties—of the spectators in this case has been exemplary on both sides I think. I have seen nothing on the part of either—either of the—And this clearly is a case where you have a division and sort of two identifiable sides and families. And up to this point that conduct has been exemplary.

So there really has been no need for security. But I think adding the security might have created the sort of speculation to the jury without being told something that might have been more harmful than not telling them anything.

So under the circumstances—They have been told we got an anonymous call. I think they understand that probably it's just a crank call they can ignore; and I think, under the circumstances, we made an adequate record. They can come in tomorrow morning, we can argue the case and submit it to them. And I think we can still get a fair verdict from the jury.

THE COURT: All right.

MR. SISSEL: I would—If I could just—You know, I would emphasize to the Court that, you know, none of us know[s] what's going on in those jurors' minds. Obviously, no one spoke up to the Court when they were addressed. Whether they wanted to get out of there after sitting in there all day, whether they didn't want us to say anything, I don't know. But to put them in a position at this point of telling them there's been threats, I just don't think the jury is going to be able to be fair.

THE COURT: Well, I'll respond briefly. I find no basis for sustaining the motion at this time. I would agree with comments made by counsel for the State in terms of his characterization of the behavior of the spectators on both sides. I think it has been exemplary taking into account the emotionally-charged nature of this case.

And, frankly, I really don't see anything in this jury's conduct or demeanor that would indicate to me that they are intending to do anything but give the evidence careful consideration and then decide the case based upon the evidence and the Court's instructions. I think, frankly, the procedure that we have employed here since the call was received is reasonable under the circumstances.

Obviously, it would be nice if things like that—this did not occur, but they do in today's world, and I've tried to respond in a manner that is fair to both sides and the jury as well.

Anything else for the record before we adjourn?

MR. DENTON: No, Your Honor.

MR. SISSEL: So just so I'm straight. They're not going to be se-

questered and you're just going to send them home until tomorrow morning?

THE COURT: I'm not going to sequester them, but I am going to admonish them at some length again. And I can either do that by having the court attendant read the lengthy admonishment that I usually employ, having you review that first, or we can do that right in the courtroom in your presence if you would prefer.

MR. SISSEL: I would prefer in the courtroom.

THE COURT: Okay. We'll do that. Trial Tr. at 878–83.

The trial court then admonished the jury, in open court, "not to listen to, view, or read any form of media overnight and while this case is in progress"; not to visit the scene of the accident; not to conduct any investigation on their own; and not to talk with anyone, or allow anyone to talk with them, about the case prior to the jury beginning its deliberations. He further instructed the jurors to advise the court immediately if someone should try to contact them about the case. Trial Tr. at 884–85. The jury was excused until the following morning.

At about 10:00 a.m. on June 10, 1998, court reconvened. At the commencement of the day's proceedings, the court admonished the jury further as follows (in pertinent part):

Before I do proceed with the reading of the Court's instructions, there is one other admonition that I did wish to give you at this time. Obviously, you are aware that there was an incident yesterday which caused the final arguments in this case to be delayed until today. That event was initiated by someone that is unknown to the Court; and that event, obviously, was beyond the control of the Court at the time or the parties to this action to prevent.

You're instructed by the Court that you are to determine this case based only upon the evidence presented during the trial, taking into account the Court's instructions. The Court is asking and instructing you not to engage in any speculation about that incident, and please keep in mind that evidence does not include anything that you saw or heard about this case outside the courtroom.

Trial Tr. at 886–87. The court then instructed the jury, the attorneys made their summations, and the case was submitted to the jury at 1:10 p.m.

At 3:10 p.m. on June 10, 1998, Atwood and the parties' counsel met with the trial judge in chambers, and a further record was made. Atwood's attorneys renewed their motion for a change of venue based on additional publicity that was generated as a result of the telephone threat. Atwood's attorneys offered three exhibits consisting of videotapes of news broadcasts from Waterloo and Cedar Rapids, Iowa, the previous evening. Counsel also renewed their motion for a mistrial based on the jury being informed about the threat, arguing as follows:

And then, in addition, we would again renew our Motion for a Mistrial in that now that the jury has heard that there are threats directed toward the participants of this trial, we feel that the outside influences that is put on this jury is not going to be— they're not going to be able to independently decide this case based on the evidence alone, and the outside influences will have an effect on their decision-making.

Trial Tr. at 978. The trial judge took the matter under advisement, and indi-

cated he would view the videotapes and make a supplemental record "if that's necessary." Trial Tr. at 979. No further record was made concerning the renewed motions, and the verdict was rendered on June 12, 1998, with the jury finding Atwood guilty of two counts of vehicular homicide. *See* Trial Tr. at 981–83.

Report and Recommendation, Doc. No. 14, at 2–16. Upon review of the record, the court adopts all of Judge Zoss's factual findings.

### C. Decisions Below

#### 1. Direct Appeal

As Atwood's habeas petition focuses only on the handling, or alleged mis-handling, of an anonymous telephone threat made against trial participants the day closing arguments were scheduled to take place, the court will only discuss those portions of the direct appeal that deal with this issue.

On appeal, Atwood contended that his constitutional rights were violated due to the manner in which the threat was handled—specifically in that the court exposed the jury to extrajudicial material that affected the jury's ability to render an impartial verdict. *State v. Atwood*, 602 N.W.2d 775, 778 (Iowa 1999). Atwood asked the court to adopt a *per se* rule that any communication between a judge and jury outside the presence of the defendant constituted reversible error. *Id.* The Iowa Supreme Court refused to adopt the *per se* rule, and instead adopted a rule that placed the burden on the party alleging error:

> [F]or a claim of error to prevail in such a case, the party making such a claim must show a reasonable likelihood that the extraneous evidence influenced the verdict.

*Id.* (citing *State v. Henning*, 545 N.W.2d 322, 324–25 (Iowa 1996)). After reviewing the record, in light of the standard for establishing error, the court further found no error in the manner in which the court handled the threat:

> The defendant does not claim any of the judge's comments were inaccurate or prejudicial. Rather, he claims that, if the court was to discuss the matter with the jury, it should have gone further and inquired of the jurors as to what effect, if any, the threat had on them. To do so, of course, would magnify the event and exacerbate any effect it might have on the jurors. Although the defendant's lawyers voiced their concern that the threat would be reported in the evening news, the jury was admonished, as it had been throughout the trial, that they were to avoid media coverage and conversations with others about the case. The court was entitled to presume the jurors would follow its admonition. *State v. Proctor*, 585 N.W.2d 841, 845 (Iowa 1998). The court's refusal to examine the jurors sua sponte was within its discretion. *See State v. Frank*, 298 N.W.2d 324 (Iowa 1980) (no abuse of discretion in not sua sponte examining jurors regarding effect of trial publicity). We find no error or abuse of discretion in the court's procedure in discussing the matter with the jury.

*Id.* at 780.

Atwood also claimed that the court, in communicating with the jury outside of his presence, denied his constitutional right to be present at every stage of the trial proceedings—amounting to reversible error. The Iowa Supreme Court disagreed:

> The court did not refuse Atwood the right to be present for the court's meeting with the jury; the defense did not request to be there (a matter discussed in connection with the claim of ineffective assistance of counsel). The judge advised the parties in advance what he planned to do, and he followed that plan.

His comments to the jury were reported verbatim and read to the parties after the meeting. The parties had an opportunity to object both before (as to the procedure being proposed) and afterward (as to the actual content of the judge's remarks). The defendant made no specific objection; he merely demanded a mistrial, which the court properly overruled. Under these circumstances, we find no per se violation of Atwood's constitutional right to be present.

*Id.* at 781.

As to Atwood's ineffective assistance of counsel claim, the court preserved the issue for postconviction relief proceedings. *Id.* at 784–85. Ultimately, all of Atwood's arguments were rejected, and his conviction was affirmed.[1] *Id.* at 785.

### 2. Postconviction relief application hearing

On June 30, 2000, Atwood filed an application for postconviction relief. A hearing on Atwood's application was held on August 21, 2001 at the Linn County Courthouse in Linn County, Iowa ("PCR court"). Atwood's application alleged that he was denied effective assistance of counsel when his trial counsel failed to have Atwood and themselves present when the judge informed the jury of the anonymous telephone threat directed at all trial participants. Atwood also argued that trial counsels' failure to request voir dire of the individual jurors at the time they were informed of the threat amounted to ineffective assistance.

In evaluating trial counsels' conduct under the performance prong of the *Strickland* analysis, the PCR court found that counsels' conduct was reasonable given the circumstances (i.e. the rare circumstance in which a threat against all trial participants is made). The PCR court stated:

> The Court finds it reasonable and within normal competency to believe that the presence of all of the parties in front of the jury concerning this threat and/or individual voir dire of the jurors would unduly emphasize the threat and place more emphasis on it. That process, then, would, in itself, create more of an impact on the jury.
>
> The Court agrees with the State's position that the Defendant's and his attorneys' presence would have put emphasis on the image of importance conveyed by the threat and thereby create a greater potential of adverse impact....

*Atwood v. Iowa,* Law No. 37893, at 7 (Dist. Court Linn County, Iowa Dec. 10, 2001). While neither attorney remembers asking to be present when the judge talked to the jury, both were convinced that the judge was firm in his position to discuss the matter with the jury without counsel, or the defendant, present. As such, the defendant's trial attorneys' strategy was to argue that the jury should not be told of the threat, that a mistrial should be granted should the jury be told, and alternatively that the jury should be sequestered if told of the threat. *Id.* at 8. The court found this tactical course within the bounds of normal competency and reason.

Looking at the second prong of the *Strickland* analysis—prejudice—the PCR court found that Atwood had failed to make an affirmative showing of prejudice. The PCR court rejected Atwood's argument that, as he was not present for the trial court's communication of the threat to the jury, prejudice should be presumed—emphasizing that the burden of proof is on

---

1. The appeal order was dated November 17, 1999. Following this order, Atwood filed a petition for rehearing, which was denied on December 8, 1999. Atwood's subsequent petition of a writ of certiorari was denied by the United States Supreme Court on April 24, 2000. *Atwood v. Iowa,* 529 U.S. 1091, 120 S.Ct. 1729, 146 L.Ed.2d 649 (2000) (mem.).

the defendant to establish to a preponderance of the evidence that there is a reasonable probability that the result of the trial would have been different. *Id.* at 9. Ultimately the PCR court held that Atwood had failed to establish the prejudice prong of the *Strickland* analysis.

Finding that Atwood had failed to demonstrate a reasonable likelihood of prejudice, and that trial counsel was not ineffective under the circumstances, the PCR court denied Atwood's application for postconviction relief in its entirety.

### 3. Appeal of denial of postconviction relief application

Atwood appealed the denial of his postconviction relief application to the Iowa Court of Appeals. The court agreed that had Atwood's trial attorneys requested to be present at the time the judge conversed with the jury about the threat, it would have been error for the judge to fail to grant the request—but noted that no such request had been made. *Atwood v. State,* 2002 WL 31883007 at *2 (Iowa App.Ct. Dec. 30, 2002). The court also stated that prejudice could be presumed when a defendant is not present at trial, though the presumption could be rebutted. *Id.* After examining the record, the court concluded that the course of action taken by trial counsel "was reached after considerable consideration and was a reasonable professional decision." *Id.* at *3. The court agreed with the PCR court that the representation was not ineffective, and affirmed the denial of Atwood's postconviction relief application. *Id.* at *3–4.

## II. LEGAL ANALYSIS

### A. Standard Of Review

#### 1. Standard for review of magistrate's report and recommendation

Pursuant to statute, this court's standard of review for a magistrate judge's report and recommendation is as follows:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge].

28 U.S.C. § 636(b)(1). Similarly, Federal Rule of Civil Procedure 72(b) provides for review of a magistrate judge's report and recommendation on dispositive motions and prisoner petitions, where objections are made, as follows:

> The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b).

The Eighth Circuit Court of Appeals has repeatedly held that it is reversible error for the district court to fail to conduct a *de novo* review of a magistrate judge's report where such review is required. *See, e.g., Hosna v. Groose,* 80 F.3d 298, 306 (8th Cir.) (citing 28 U.S.C. § 636(b)(1)), *cert. denied,* 519 U.S. 860, 117 S.Ct. 164, 136 L.Ed.2d 107 (1996); *Grinder v. Gammon,* 73 F.3d 793, 795 (8th Cir.1996) (citing *Belk v. Purkett,* 15 F.3d 803, 815 (8th Cir.1994)); *Hudson v. Gammon,* 46 F.3d 785, 786 (8th Cir.1995) (also citing *Belk), cert. denied,* 518 U.S. 1025, 116 S.Ct. 2564, 135 L.Ed.2d 1081 (1996). Because objections have been filed in this case to Judge Zoss's legal conclusions, the court must conduct a *de novo* review.

## 2. General standards for § 2254 relief

Section 2254(d)(1) of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996 governs Atwood's petition.

Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "contrary to … clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of … clearly established Federal law, as determined by the Supreme Court of the United States."

*Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (quoting 28 U.S.C. § 2254(d)(1)).[2] In this instance Atwood seeks habeas relief under the second category. An "unreasonable application" of Federal law by a state court can occur in two ways: (1) where "the state court identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case"; or (2) where "the state court either unreasonably extends a legal principle from [Supreme] Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407, 120 S.Ct. 1495. It is not enough that the state court applied clearly established federal law erroneously or incorrectly—the application must additionally be unreasonable. *Id.* at 411, 120 S.Ct.

1495; *see Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) ("an unreasonable application is different from an incorrect one.").

### B. Jury's Exposure To Extrajudicial Material

#### 1. Atwood's objections

Atwood lodges three basic objections to the Report and Recommendation with regard to the jury's exposure to extrajudicial material: (1) the placement of the burden on Atwood to show that the extraneous material prejudiced the jury when federal law places the burden of proof on the government to rebut a presumption that it was prejudicial; (2) the conclusion that the trial court's actions were reasonable, did not affect juror impartiality, and were supported by the record in light of the fact that the jurors were never questioned as to the effect the extrajudicial material had on them; and (3) the rejection of Atwood's position—telling the jury of the threat created an inference that he was responsible for the threat because it was wholly unreasonable to believe the state was responsible for the call—in light of the record which shows defense counsel making numerous objections to the court's handling of the threat, while the prosecutor remained relatively quiet. Atwood contends that exposing the jury to this extrajudicial information affected the jury's ability to render an impartial verdict in violation of the Sixth and Fourteenth Amendments of the United States Constitution.

#### 2. The law

Atwood's objections rely almost exclusively on the case of *Remmer v. United*

---

**2.** Section 2254(d)(2) also allows a writ of habeas corpus to issue if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(2); *see cf. Sexton v. Kemna,* 278 F.3d 808, 811 (8th Cir.), *cert. denied,* 537 U.S. 886, 123 S.Ct. 129, 154 L.Ed.2d 145 (2002). Atwood does not seek habeas relief on this ground.

*States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954)—which Atwood contends imposes a presumption of prejudice, which it is the government's burden to rebut, and which federal law dictates must be applied in this case. In *Remmer,* a third party communicated to a specific juror that a verdict favorable to Remmer would be profitable to the juror. *Id.* at 228, 74 S.Ct. 450. The juror reported the incident to the judge, who advised the prosecuting attorneys of the communication—this resulted in an investigation and report by the Federal Bureau of Investigation. The FBI report was reviewed *only* by the judge and the prosecutors, and after reviewing the report they concluded that the statement was not intended to be serious, and the matter was dropped. The juror to whom the third-party had communicated was later elected as foreperson of the jury, and the jury went on to enter a guilty verdict against Remmer. Neither Remmer, or his counsel, were aware of this communication until after the verdict was rendered—when counsel read about it in the newspaper. Upon learning of the extrajudicial communication, defense counsel filed a motion for a mistrial and requested a hearing to determine the circumstances surrounding the communication and its effect on the jury. *Id.* The district court did not hold the requested hearing, and denied the motion for a new trial. *Id.* at 229, 74 S.Ct. 450. The court of appeals held that the district court had not abused its discretion, as Remmer had failed to show that he was prejudiced by the event. *Id.* The Supreme Court granted certiorari. *Id.*

The *Remmer* Court noted that the government *conceded* that the trial court handled the matter in a way that may have been prejudicial to petitioner Remmer. *Id.* at 229, 74 S.Ct. 450. The Court then analyzed the issue in the following manner:

In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in the pursuance of known rules of the court and the instructions and directions of the court made during trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. *Mattox v. United States,* 146 U.S. 140, 148–50, 13 S.Ct. 50, 52–53, 36 L.Ed. 917 [(1892)]; *Wheaton v. United States,* 8 Cir., 133 F.2d 522, 527 [(1943)].

We do not know from this record, nor does the petitioner know, what actually transpired, or whether the incidents that may have occurred were harmful or harmless. The sending of an F.B.I. agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror and is very apt to do so unduly. A juror must feel free to exercise his functions without the F.B.I. or anyone else looking over his shoulder. The integrity of jury proceedings must not be jeopardized by unauthorized invasions. The trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.

*Remmer v. United States,* 347 U.S. 227, 229–30, 74 S.Ct. 450, 98 L.Ed. 654 (1954). Ultimately, the Court vacated the judgment of the court of appeals, and remanded the case to the district court for a hearing to determine if the incident was harmful to Remmer, and if harm was found to grant a new trial. *Id.* at 230, 74 S.Ct. 450.

### 3. Judge Zoss's analysis

In finding the *Remmer* presumption inapplicable, and instead applying Iowa law which places the burden on Atwood to establish prejudice, Judge Zoss focused on the reasoning and rationale utilized in *Tunstall v. Hopkins*, 126 F.Supp.2d 1196 (N.D.Iowa 2000) (*"Tunstall I"*) in which the court noted the "significant distinction between the standard that is applied when considering a claim raised by a state prisoner contending he was denied the right to a trial by an impartial jury and the standard that is applied when considering the same claim raised by a federal prisoner." *Id.* at 1202. In *Tunstall I*, counsel for a co-defendant of the petitioner observed a newspaper containing an article about the ongoing trial in the jury room. *Id.* at 1204–05. Based on this observation, the petitioner claimed his right to an impartial jury had been impermissibly violated. *Id.* at 1202. The court noted that while "federal prisoners challenging their federal court convictions benefit from" a presumption of prejudice, this presumption does not rise to the level of a constitutional ruling "applicable[ ] through the Fourteenth Amendment to the States." *Id.* at 1202–03 (citation and quotation omitted). The court also noted that the Supreme Court had presumed prejudice of a constitutional magnitude in instances where pretrial publicity was "so pervasive, inflammatory and widespread that the trial [is] 'but a hollow formality,' or when pre-trial and mid-trial publicity is so invasive that the setting of the trial becomes inherently prejudicial." *Id.* at 1203 (quoting *Murphy v. Florida*, 421 U.S. 794, 803, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975)). Ultimately, given the circumstances presented, and in light of the fact that the petitioner sought § 2254 relief and not § 2255 relief, the court was unable to find "a violation of constitutional magnitude" and denied the petitioner habeas relief. *Id.* at 1207. The Eighth Circuit Court of Appeals affirmed

this court's denial of habeas relief in *Tunstall v. Hopkins*, 306 F.3d 601 (8th Cir. 2002), *cert. denied*, 538 U.S. 968, 123 S.Ct. 1767, 155 L.Ed.2d 525 (2003) (*"Tunstall II"*), holding that federal law did not mandate application of a presumption of prejudice:

> Federal law does not clearly compel a presumption of prejudice in this case. In *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the Supreme Court held that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is ... deemed presumptively prejudicial." *Accord United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *Smith v. Phillips*, 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Several circuits, including ours, have extended the *Remmer* presumption to claims alleging juror exposure to extraneous information, including claims of mid-trial media exposure. *See, e.g., Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 922 (10th Cir.1992); *United States v. Perkins*, 748 F.2d 1519, 1533–34 (11th Cir. 1984); *United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir.1983); *United States v. Bassler*, 651 F.2d 600, [6]03 (8th Cir.1981). However, other circuits have confined the application of *Remmer* to cases alleging third-party contact with jurors. *See, e.g., United States v. Lloyd*, 269 F.3d 228, 238 (3d Cir.2001); *United States v. Williams–Davis*, 90 F.3d 490, 501–02 (D.C.Cir.1996); *United States v. Boylan*, 898 F.2d 230, 260–61 (1st Cir.1990). When federal circuits disagree on the application of *Remmer* regarding any presumption of prejudice, it is difficult to say the Iowa court's decision is contrary to, or involved an unreasonable application of, clearly es-

tablished federal law, as determined by the Supreme Court.

*Tunstall II,* 306 F.3d at 610–11(footnote omitted). Using these decisions as a backdrop, Judge Zoss determined that the Iowa courts were not required to apply the *Remmer* presumption to Atwood's claims of jury taint, and that placement of the burden on Atwood to prove that the extraneous information impacted the jury's impartiality was appropriate. *See* Report and Recommendation, Doc. No. 14, at 20–24. For the following reasons, this court believes that Judge Zoss's position is the correct one.

### 4. *Application*

■ As noted in *Tunstall II,* there is considerable disagreement over the application of the *Remmer* presumption. *See Tunstall II,* 306 F.3d at 611. The strength and application of *Remmer* has also been called into question by the Supreme Court's subsequent rulings in *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) and *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).[3] Though the Eighth Circuit Court of Appeals has not yet encountered a situation requiring it to determine what effect *Phillips* and *Olano* have on the *Remmer* presumption, *see King v. Bowersox,* 291 F.3d 539, 541 (8th Cir.) (declining to address whether *Remmer* survived the Court's holdings in *Olano* and *Phillips* where there was no showing that the jury saw or was aware of a hallway display in memory of the victim), *cert. denied,* 537 U.S. 1093, 123 S.Ct. 693, 154 L.Ed.2d 641 (2002), it has held that follow-

ing *Phillips,* in order to warrant a hearing on whether outside contact influenced juror impartiality, the party requesting such a hearing must "show[ ] that the outside contact with the jury presents a reasonable possibility of prejudice to the verdict." *United States v. Tucker,* 137 F.3d 1016, 1030 (8th Cir.1998). Other federal circuit courts have held that *Phillips* and *Olano* softened, or limited, the application of the presumption established in *Remmer. See, e.g., Caliendo v. Warden of California Men's Colony,* 365 F.3d 691, 696 (9th Cir. 2004) (interpreting *Phillips* to hold that where "an unauthorized communication with a juror is *de minimis,* the defendant must show that the communication could have influenced the verdict before the burden shifts to the prosecution."); *United States v. Orlando,* 281 F.3d 586, 598 (6th Cir.) (noting that the Sixth Circuit has held that *Phillips* "reinterpreted *Remmer* to shift the burden of showing bias to the defendant rather than placing a heavy burden on the government to show that an unauthorized contact was harmless.") (citation and quotation omitted), *cert. denied,* 537 U.S. 947, 123 S.Ct. 411, 154 L.Ed.2d 290 (2002); *United States v. Sylvester,* 143 F.3d 923, 933–34 (5th Cir.1998) (asserting that *Phillips* reconfigured the *Remmer* standard such that the presumption of prejudice is no longer automatic, but determined at the discretion of the trial court); *see also Boykin v. Leapley,* 28 F.3d 788, 790 (8th Cir.1994) ("We are not convinced, however, that *Remmer* established the rule that any extrajudicial communication with a juror is presumed to deprive a criminal defendant of due pro-

---

**3.** Both *Phillips* and *Olano* seem to suggest that there is no constitutional violation unless the defendant can demonstrate that the alleged intrusion or misconduct resulted in actual prejudice. *See Olano,* 507 U.S. at 739, 113 S.Ct. 1770 ("There may be cases where an intrusion should be presumed prejudicial, but a presumption of prejudice as opposed to

a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberation and thereby its verdict?") (citations omitted); *Phillips,* 455 U.S. at 215, 102 S.Ct. 940 ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.").

cess under the Fourteenth Amendment."); *but see United States v. Scull*, 321 F.3d 1270, 1280 n. 5 (10th Cir.2003) (noting that other circuit courts had questioned the survival of the *Remmer* presumption, but finding no Supreme Court authority it construed as directly limiting the presumption, reviewing the defendant's claim under the traditional *Remmer* analysis). The Sixth Circuit Court of Appeals has gone so far as to hold that in light of *Phillips*, *Remmer* only controls the manner in which a district court must proceed when allegations of jury partiality are made, but that prejudice is not to be presumed and the defendant carries the burden of proof to demonstrate that the exposure to extraneous information resulted in juror partiality. *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). Clearly, there remains considerable unrest surrounding the application and strength of the *Remmer* presumption. As such the court cannot find that the *Remmer* presumption is "clearly established federal law as determined by the Supreme Court." *Accord Tunstall II*, 306 F.3d at 610. Likewise, failure to apply *Remmer* does not amount to a violation of a constitutional magnitude—which is necessary for relief under § 2254 to be warranted.

Though the fact that *Remmer* is not "clearly established federal law" forecloses any contest to the Iowa courts failure to apply *Remmer*, additional reasons exist for *not* applying the presumption in this case. First, there are questions as to whether

trial judge contact with the jury, with the knowledge of all parties, amounts to "extrajudicial" contact triggering the presumption. In this instance, where the contact was between the trial court judge and the jury, occurred with the knowledge of counsel and the defendant, and the contents of the communication were recorded and divulged to counsel and the defendant, it is hard to categorize this communication as "extrajudicial.[4]" *Cf. Rushen v. Spain*, 464 U.S. 114, 119–20, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (employing a harmless error analysis, not a *Remmer* analysis, in evaluating whether *ex parte*, unrecorded, communication between trial judge and a juror was prejudicial). As the jurors learned of the threat via the court and not from a third-party, it is also questionable as to whether the communication could be classified as exposing the jury to "extraneous information." *see United States v. Tran*, 122 F.3d 670, 673 (8th Cir.1997) (holding that information disclosed to jurors as a result of their presence at trial (i.e. that the defendant did not testify) did not constitute "extraneous prejudicial information" within the meaning of the Rule 606(b) exception); *United States v. Rodriquez*, 116 F.3d 1225, 1227 (8th Cir.1997) (same).

Second, even under a *Remmer* rubric, controlling federal precedent would still likely place the burden on the defendant. As previously stated, *Remmer* deems any private communication or contact "with a juror during a trial about the matter pending before the jury ... presumptively prejudicial." *Remmer*, 347

4. "Extrajudicial" is defined as follows:
    That which is done, given, or effected outside the course of regular judicial proceedings. Not founded upon, or unconnected with, the action of a court of law, as *e.g.* extrajudicial evidence, or an extrajudicial oath.
    That which, though done in the course of regular judicial proceedings, is unnecessary

to such proceedings, or interpolated, or beyond their scope; as an extrajudicial opinion. (*dictum*).
    That which does not belong to the judge or his jurisdiction, notwithstanding the fact that he takes cognizance of it.
BLACK'S LAW DICTIONARY 586 (6th ed.1990).

U.S. at 229, 74 S.Ct. 450. However the "presumption of prejudice *does not apply* unless the extrinsic contact relates to 'factual evidence not developed at trial.'" *United States v. Blumeyer*, 62 F.3d 1013, 1016 (8th Cir.1995) (quoting *United States v. Cheyenne*, 855 F.2d 566 (8th Cir.1988)), *cert. denied*, 516 U.S. 1172, 116 S.Ct. 1263, 134 L.Ed.2d 212 (1996); *see United States v. Rodriguez*, 367 F.3d 1019, 1029 (8th Cir.2004) ("the presumption of prejudice does not apply unless the extrinsic contact relates to factual evidence not developed at trial"); *United States v. Hall*, 85 F.3d 367, 371 (8th Cir.1996) (noting that the presumption of prejudice is inapplicable where the contact does not relate to factual evidence not developed at trial, or where the contact pertains to purely legal issues), *cert. denied*, 529 U.S. 1027, 120 S.Ct. 1437, 146 L.Ed.2d 326 (2000); *United States v. Wallingford*, 82 F.3d 278, 281 (8th Cir. 1996) (holding petitioner's reliance on *Remmer* misplaced as statement from restaurant cashier to juror expressing cashier's hope that the juror find the defendant not guilty did not refer to the factual evidence not developed at trial). In this case, the trial judge informed the jury only that the trial was delayed due to an anonymous threat, that closing arguments would be delayed until the following day, and that additional security measures would be in place when the jurors arrived the next day. Though the trial judge divulged that a threat against virtually all trial participants was made, he did not tell the jury or the press that the threat was contingent on the jury reaching a particular verdict. There was *no mention* of the defendant, or the government, in this conversation—just a neutral statement that a threat had been made, a discussion of how the threat impacted security and the trial schedule, and an opportunity for the jurors to ask questions. *Nothing* bearing on the facts of the case was mentioned. *See State v. Williams*, 341 N.W.2d 748, 751 (Iowa 1983) (finding harmless a communication from the trial court to the jury where "[t]he communication was not an instruction on the law and had no bearing on the evidence the jurors were to consider."). The trial judge's disclosure of the threat, and the security ramifications and procedural alternations of the trial necessitated by the threat, merely exposed the jury to an extraneous fact which had no bearing on the facts of the case, the evidence, the charges in the indictment or the defendant. This court would be hard pressed to classify the communication as bearing on the defendant or the indictment, or factual evidence not developed at trial. Therefore, as the information imparted to the jury by the trial judge had no bearing on the facts of the case or the charges against the defendant, the *Remmer* presumption is inapplicable to that extraneous communication.[5] *See Wallingford*, 82 F.3d at 281 (refusing to apply the *Remmer* presumption where third-party remark to juror did not refer to the factual evidence at trial); *Cheyenne*, 855 F.2d at 568 (refusing to apply a pre-

---

**5.** On the slightest chance that *Remmer* would apply, the presumption of prejudice "'may be rebutted, where . . . the proper reaction of the court establishes that the defendant has not been prejudiced.'" *United States v. Behler*, 14 F.3d 1264, 1268 (8th Cir.) (quoting *United States v. Rowley*, 975 F.2d 1357, 1363 (8th Cir.1992)), *cert. denied*, 513 U.S. 960, 115 S.Ct. 419, 130 L.Ed.2d 335 (1994); *see also United States v. Willis*, 277 F.3d 1026 1033–34 (8th Cir.2002) (noting that the presumption can be rebutted where the court's reaction

establishes that the defendant was not prejudiced). In this case the "proper reaction of the court" in privately notifying counsel and the defendant of the threat, neutrally informing the jury of the threat on the record, allowing the jurors the opportunity to ask questions or voice any concerns, reading the record of what was said to counsel and the defendant and admonishing the jury at length not to view news media coverage of the trial, would rebut any potential prejudice. *See id.*

sumption of prejudice where the extraneous information considered by the jury "did not bear on the defendant or the acts alleged in the indictment"). Ultimately, as under Iowa law, without the benefit of the *Remmer* presumption, the burden falls on Atwood to show actual prejudice. *Wallingford*, 82 F.3d at 281–82; *see Doe v. Johnston*, 476 N.W.2d 28, 35 (Iowa 1991) (placing burden on "party seeking reversal" to demonstrate that the exposure to extraneous material was reasonably probable to influence the verdict looking at a totality of the circumstances).

■ Atwood has wholly failed in carrying his burden. Atwood has provided no juror affidavits or other evidence suggesting that the jurors were prejudiced by the trial judge's disclosure of the threat. Despite knowing of the threat, the jury still deliberated for a full two days—a fact which, in the absence of any evidence of actual prejudice, forecloses the inquiry into whether the juror's impartiality was compromised. As the Supreme Court has recognized:

> [D]ue process does not require a new trial every time a juror has been placed

in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable.... [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Phillips*, 455 U.S. at 217, 102 S.Ct. 940, 71 L.Ed.2d 78. This is such a case in which the trial judge's communication with the jurors, though extraneous and outside the course of "normal" proceedings, did not result in prejudice to the defendant or compromise the impartiality of the jury.

Further, though Atwood *speculates* that the jurors were exposed to print and television media coverage of the threat, and subsequent delay of closing arguments, on the evening before closing arguments were re-scheduled to begin, Atwood offers *no proof* that any juror actually saw media coverage relating to the threat, let alone relied on it.[6] *See United States v. Schop-*

---

6. Atwood contends that Iowa Rules of Evidence prevent him from offering any evidence of jury reliance on extraneous information, or exposure to prejudicial influences. Atwood centers this argument on Iowa Rule of Evidence 5.606, which provides in relevant part:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit

or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Iowa R. Evid. 5.606(b) (2004); *see* Fed. R. Evid. 606(b) (2004). It is true that the rule "renders jurors incompetent to testify regarding arguments, votes, and mental reactions occurring during the deliberations." *Doe v. Johnston*, 476 N.W.2d 28, 35 (Iowa 1991). However, the rule *specifically allows* jurors to testify as to whether any juror was subjected to extraneous prejudicial information—such as exposure to the news media accounts of the threat and the trial delay. In the absence of an operative presumption to the contrary, this is the burden the befalls a party claiming prejudice due to the jury's receipt of extraneous information—the party seeking relief is charged with demonstrating prejudice via evidence admissible under Rule 5.606 (or Federal Rule 606). *See, e.g., United States v. Fran-*

*pert,* 362 F.3d 451, 460 (8th Cir.2004) (finding no abuse of discretion in district court's instruction to jury to disregard bench conferences rather than order a *Remmer* hearing where defendant offered no proof beyond a speculative theory that the jury had overheard these conversations); *King,* 291 F.3d at 541 (finding no need to embark on a *Remmer* analysis in the absence of a showing that the jury saw or was aware of hallway display in memory of victim). "The record is void of juror affidavits, testimony or any other evidence that any juror in this case saw or read" any media accounts of the anonymous telephone threat. *Tunstall,* 306 F.3d at 608. Moreover, on numerous occasions, both before and after the threat was received, the trial judge admonished the jury to avoid media coverage regarding the case. *See* Trial Tr. at 209–10 (following jury selection, the court gave the following admonishment: "I need to make sure that you understand that you are not to give consideration to any media accounts that might appear in any form of media while this case is in progress. I'm instructing you, and both parties are counting on you, not to listen to, view, or read any accounts of this case in any form of media while it's in progress."); Trial Tr. at 371 (following day two of trial: "You're instructed by the Court not to read, listen to or view any

news reports which may be made about this case."); Trial Tr. at 507 (following day three of trial: the court reminded the jury, generally, to "remember the admonitions"); Trail Tr. at 664 (following day four of trial: "please remember that you have been instructed by the Court not to read, listen to, or view any accounts of this case that might appear in any form of media"); Trial Tr. at 744 (following day five of trial: "And you're reminded by the court that you're not to read, listen to, or view any news accounts of this case that might appear in any form of media."); Trial Tr. at 884 (following the trial judge's discussion of the threat with the jury, the judge admonished the jury not "to listen to, view or read any form of media overnight or while this case is in progress"). Also, before the start of closing arguments, the court admonished the jury to decide the case *solely* on the evidence, and to give no consideration or discussion to the threatening phone call that had been received the day before:

Obviously, you are aware that there was an incident yesterday that caused the final arguments in this case to be delayed until today. That event was initiated by someone that is unknown to the Court; and that event, obviously, was beyond the control of the Court at

*cis,* 367 F.3d 805, 828 (8th Cir.2004) (holding that to impeach a jury verdict the defendant must produce evidence that is both not barred by Federal Rule 606(b) and sufficient to prove grounds adequate to overturn the verdict); *United States v. Tucker,* 137 F.3d 1016, 1030 (8th Cir.1998) ("To gain a new trial on the ground of juror misconduct, a movant must present evidence that is not barred by Federal Rule of Evidence 606(b) and that establishes grounds recognized as adequate to overturn a jury verdict."); *State v. Dacken,* 2004 WL 1252045 at *2–3 (Iowa Ct.App. Jun.9, 2004) (discussing how consideration, in ruling on defendant's motion for new trial, of juror's testimony was permissible as it related only to the " 'question whether extraneous prejudicial

information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.' ") (quoting Iowa R. Evid. 5.606(b)). Therefore, Iowa Rule 5.606 does not restrict any defendant, including Atwood, from proffering evidence of the jury's exposure to extraneous or prejudicial information. Further, the Iowa Rule is *identical* to the Federal Rule, so Atwood cannot claim disadvantage when he was in the same position, with regard to the applicable rule of evidence, as any federal defendant seeking to establish jury exposure to extraneous information would have been. For these reasons, the court rejects Atwood's argument that Iowa law prevented him from carrying his burden of proof.

the time or the parties to this action to prevent.

You are instructed by this Court that you are to determine this case based only upon the evidence presented during the trial, taking into account the Court's instructions. The Court is asking and instructing you not to engage in any speculation about that incident, and please keep in mind that evidence does not include anything that you saw or heard about this case outside the courtroom.

Trial Tr. at 886–87. Absence evidence to the contrary, the jurors are presumed to have followed the court's instructions and admonitions, and to have not listened, viewed, or read, any news media accounts regarding the trial. *See Tunstall,* 306 F.3d at 609 ("in the absence of contrary evidence, we presume, as do Iowa courts, that jurors will follow court admonitions to avoid media coverage regarding a case upon which they are sitting"); *Blumeyer,* 62 F.3d at 1017 ("It must be presumed that jurors follow such instructions."). Atwood has provided no evidence to rebut this presumption, therefore the jurors are presumed to have had *no exposure* to media coverage of the case. Therefore, Atwood's reliance on the news media accounts of the threat on the night before closing arguments were set to begin to establish jury taint and prejudice is nothing more than a bald assertion insufficient to support an allegation of prejudice. *See Schoppert,* 362 F.3d at 459 ("A bald assertion of taint will not suffice: the defendant needs to make a showing that this allegation is credible and that the prejudice alleged is serious enough to warrant whatever action is requested."). Insofar as this court is concerned, the entire universe of information the jury had regarding the threat was that which the trial judge communicated to it, and no more. This court has already held that Atwood was unable to demonstrate that the trial judge's com-

munication with the jury prejudiced Atwood or the verdict in any way.

■ Finally, sounding the death knell against any finding of prejudice to Atwood, is the presumption of correctness that this court must accord to the Iowa state courts' findings of juror impartiality:

[T]he factual findings arising out of the state courts' post-trial hearings are entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(d); *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). ***The substance of the ex parte communications and their effect on juror impartiality are questions of historical fact entitled to this presumption.*** Thus, they must be determined, in the first instance, by state courts and deferred to, in the absence of "convincing evidence" to the contrary, by the federal courts. *See Marshall v. Lonberger,* [459] U.S. [422], [432], 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983). Here, both the state's trial and appellate courts concluded that the jury's deliberations, as a whole, were not biased. This finding of "fact"—on a question the state courts were in a far better position than the federal courts to answer—deserves a "high measure of deference," *Sumner v. Mata,* 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982), and may be set aside only if it "lack[s] even 'fair support' in the record." *Marshall v. Lonberger, supra,* 459 U.S., at [432], 103 S.Ct., at 850.

*Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (emphasis added); *accord Cheyenne,* 855 F.2d at 568 (noting that substantial weight is given to the trial court's assessment "of the prejudicial effects on the jury, since the trial judge has the advantages of close observation of the jurors and intimate familiarity with the issues at trial"). After the record of what the trial judge had said to the jury

was read to counsel and the defendant, defense counsel made a motion for a mistrial, in part based on the fact that they believed the jury's impartiality to have been irreparably tainted. In denying the motion, the court stated that there was nothing to indicate that the jury would be affected by information of the threat, or would fail to follow the court's instructions:

I find no basis for sustaining the motion at this time. I would agree with comments made by counsel for the State in terms of his characterization of the behavior of the spectators on both sides. I think it has been exemplary taking into account the emotionally-charged nature of this case.

And, *frankly, I really don't see anything in this jury's conduct or demeanor that would indicate that they are intending to do anything but give the evidence careful consideration and then decide the case based upon the evidence and the Court's instructions.* I think, frankly, the procedure that we have employed here since the call was received is reasonable under the circumstances.

Trial Tr. at 882–83. On direct appeal, and during postconviction relief, Atwood did not claim that trial judge's comments were inaccurate or prejudicial, and therefore those courts did not address whether the jury's impartiality was compromised by the trial judge's communication. *Atwood,* 602 N.W.2d at 780. Nothing in the record indicates that the trial court erred in finding that the jurors' impartiality was untainted by knowledge that the threat had been made, and that changes to the trial schedule would have to be made as a consequence. Atwood has offered no "convincing evidence" to rebut the presumption

of correctness this court must accord the lower courts' findings of impartiality of the jury. *See Tunstall,* 306 F.3d at 605 (quoting § 2254(e)(1) for the fact that the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence).

For the various reasons articulated above, the court finds that the Iowa courts did not run afoul of clearly established federal law in assigning Atwood the burden of showing that communicating information regarding the threat to the jury resulted in prejudice. Atwood has failed to carry his burden of demonstrating that exposure to the information tainted the jury. The court concurs with Judge Zoss's resolution of this claim and Atwood's objections are likewise **overruled**.

### C. Denial Of Right To Be Present During Proceedings

#### 1. Atwood's objections

Atwood first objects to Judge Zoss's finding that he waived his right to be present when the judge informed the jury about the threatening phone call by failing to request that he be present. Atwood contends that the trial judge *had an independent duty* to "offer, invite or include Atwood and his counsel in the meeting *regardless*" of defense counsels' failure to expressly request his presence. Objections to the Magistrate Judge's Report and Recommendation on Petition for Writ of *Habeas Corpus,* Doc. No. 15, at 11 ("Objections"). Second, Atwood objects to Judge Zoss's finding that any error was harmless—especially in light of the fact that under Iowa law Atwood was precluded from presenting evidence, in the form of affidavits or testimony, as to jury partiality,[7] and in light of the government's

---

**7.** Atwood voiced this same argument in objecting to Judge Zoss's finding that Atwood failed to meet his burden of establishing prejudice by the trial judge's communication with the jury informing them of the threatening

phone call. The court rejected Atwood's position before, *supra* footnote 6, and for the same reasons and rationales, it rejects this position again here.

burden to rebut the prejudice inferred from the *ex parte* communication. Finally, Atwood seems to implicitly object, via the phrasing of his objections, that Judge Zoss incorrectly used the "substantial and injurious effect or influence" harmless error standard when he contends that the communication was not harmless beyond a reasonable doubt.

### 2. *The law*

■■ The law is clear that "a defendant has a due process right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.... [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" *United States v. Gagnon,* 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105–06, 108, 54 S.Ct. 330, 78 L.Ed. 674 (1934)); *see Peterson v. United States,* 411 F.2d 1074, 1080–81 (8th Cir.) (noting that while the defendant has a constitutional right to be present at all stages of the criminal proceeding, the defendant is not entitled to habeas corpus relief where the defendant's substantial rights were not prejudiced by his absence), *cert. denied,* 396 U.S. 920, 90 S.Ct. 247, 24 L.Ed.2d 199 (1969). Whether the exclusion of a defendant from a part of the proceedings violates due process is something that must be determined from looking at the record as a whole. *See Snyder,* 291 U.S. at 115, 54 S.Ct. 330, 78 L.Ed. 674.

This court reviews the absence of the defendant at the time the trial judge communicated the existence of the threat to the jury for harmless error. *See Rushen,* 464 U.S. at 118 n. 2, 104 S.Ct. 453, 78 L.Ed.2d 267 ("[T]he right to be present during all critical stages of the proceedings ... [is] subject to harmless error analy-

sis."); *United States v. Shepherd,* 284 F.3d 965, 968 (8th Cir.2002) (reviewing trial judge's exclusion of the defendant from proceedings without warning the defendant first for harmless error); *Wallingford,* 82 F.3d 278, 280 (8th Cir.1996) (reviewing defendant's absence for harmless error where defendant conceded he was a fugitive and could not prove he was involuntarily absent); *Nevels v. Parratt,* 596 F.2d 344, 346 (8th Cir.) (reviewing defendant's absence from in camera hearing regarding possible juror misconduct for harmless error), *cert. denied,* 444 U.S. 859, 100 S.Ct. 122, 62 L.Ed.2d 79 (1979); *Jackson v. Hutto,* 508 F.2d 890, 892 (8th Cir. 1975) ("The courts are almost uniform in holding that [*ex parte* communications between judge and jury], although presumptively prejudicial, may be shown to constitute harmless error.")

In a habeas corpus case, we apply the more deferential harmless error review standard of *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (substantial or injurious effect or influence on the jury's verdict) to constitutional errors that have been subject to harmless error analysis by state courts. *See Joubert v. Hopkins,* 75 F.3d 1232, 1245 (8th Cir.1996). However, we use the strict standard set out in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (harmless beyond a reasonable doubt) in cases where the state court has not applied the *Chapman* analysis in the first instance. *See Joubert,* 75 F.3d at 1245. *Barrett v. Acevedo,* 169 F.3d 1155, 1164 (8th Cir.), *cert. denied,* 528 U.S. 846, 120 S.Ct. 120, 145 L.Ed.2d 102 (1999); *see also Pruett v. Norris,* 153 F.3d 579, 589 n. 13 (8th Cir.1998) (noting that the harmless error inquiry consists of an analysis of whether the error had substantial and injurious effects on the verdict where the state court had already conducted a harmless error analysis consistent with *Chap-*

*man,* but where the state court did not conduct a harmless error analysis the more stringent "harmless beyond a reasonable doubt" standard must be utilized by the federal habeas court); *Orndorff v. Lockhart,* 998 F.2d 1426, 1430 (8th Cir. 1993) (same). In this instance, the Iowa Supreme Court did not specifically cite to *Chapman,* but did conduct a harmless error analysis on Atwood's claim of error due to his absence when the trial judge told the jury of the threat. *State v. Atwood,* 602 N.W.2d 775, 780–81. The harmless error review conducted by the Iowa Supreme Court was sufficiently rigorous to meet the *Chapman* standard.[8] The Iowa Supreme Court noted that a criminal defendant had a right to be present at all stages of trial, that prejudice is presumed where the defendant is absent from any stage of the trial, that this prejudice can be rebutted by a harmless-error analysis, and that only exceptional circumstances warranted the application of a *per se* rule of prejudice. *Id.* Upon this foundation, and in light of the specific circumstances of the case, the Iowa Supreme Court found no prejudice and held that there was "no per se violation of Atwood's constitutional right to be present." *Id.* at 781. As the state court has already conducted a harmless error analysis of *Chapman* magnitude, this court must review whether Atwood's claimed constitutional violation had a "substantial and injurious effect or influence in determining the jury's verdict."[9] *Brecht,*

---

8. In this regard, the court disagrees with Judge Zoss's Report and Recommendation to the extent that he found that the state court failed to conduct a test similarly rigorous to *Chapman.* Report and Recommendation, Doc. No. 14, at 28 n.4. Recently, in *Brown v. Luebbers,* 371 F.3d 458 (8th Cir.2004), the Eighth Circuit held that the Missouri Supreme Court had indeed conducted the rigorous harmless error analysis required by *Chapman:*

> [T]here are no magic words that must be invoked before we can conclude that the Missouri Supreme Court decided that any error was harmless beyond a reasonable doubt. But here, the state court's use of "prejudicial" signals to us the application of the *Chapman* standard, as the Supreme Court has long considered prejudice in its *Chapman* harmless-error analyses.

*Id.* at 461–63 (citations omitted). Therefore, the Eighth Circuit Court of Appeals considers an analysis for "prejudice" by the state court as equating to the "beyond a reasonable doubt" test required by *Chapman.* In this case, the Iowa Supreme Court did use words such as prejudice and prejudicial in its analysis of Atwood's Sixth Amendment claims. *State v. Atwood,* 602 N.W.2d at 780–81. Therefore, this court finds that the Iowa Supreme Court did conduct a test of similar rigor as that required by *Chapman.* However, in Judge Zoss's defense, his Report and Recommendation was filed at least four months prior to the *Brown* decision by the Eighth Circuit Court of Appeals—therefore, Judge Zoss lacked *Brown's* guidance when he formulated his opinion as to the adequacy of the state court's analysis.

9. In his Report and Recommendation, Judge Zoss noted that the Eighth Circuit Court of Appeals, in *Barrett v. Acevedo,* 169 F.3d 1155, 1164 (8th Cir.1999), dictated the application of the *Chapman* harmless error beyond a reasonable doubt test "where, as here, the state court failed to conduct a similarly rigorous test." Report and Recommendation, Doc. No. 14, at 28 n.4. Judge Zoss went on to note that *Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001), which applied the more lenient "substantial and injurious effect or influence" harmless error standard, was decided after *Barrett,* and therefore the more lenient standard should apply in this case. *Id.* This court has arrived at the same conclusion, that the "substantial and injurious effect or influence" standard applies, but via a different path. Unlike the Report and Recommendation, which found this standard applicable as *Penry* superceded *Barrett,* this court arrived at the application of the "substantial and injurious effect or influence" standard under the guidance of *Barrett.* As both Judge Zoss and this court would apply the same standard, at this time the court voices no opinion as to whether *Penry* superceded or limited *Barrett,* in that the "substantial and injurious effect or influence" harmless error standard should be applied regardless of whether the state court

507 U.S. at 637, 113 S.Ct. 1710; *see also Penry v. Johnson,* 532 U.S. 782, 795, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (same). To the extent Atwood objects to the application of the "substantial and injurious effect or injury" harmless error standard in evaluating this claim, the objection is overruled.

### 3. Analysis

#### a. Waiver

■ Atwood's first objection is directed at Judge Zoss's finding that he waived his right to be present. In his Report and Recommendation, Judge Zoss found that because Atwood failed to request his presence when the trial judge communicated the information regarding the threat to the jury, and in the absence of any legal authority placing an affirmative duty on the trial judge to ensure his presence at this meeting, Atwood waived his right to be present. Atwood contends that regardless of his trial counsels' failure to request his presence, the trial judge had an obligation to invite him to, and secure his presence at, the meeting in which the jury was informed of the threatening phone call.

■ The law is clear in that a defendant's right to be present at all phases of the trial is not absolute, and can be waived. *See, e.g. Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (recognizing a trial judge's discretion to remove "disruptive, contumacious, stubbornly defiant defendants"); *See Diaz v. United States,* 223 U.S. 442, 454, 32 S.Ct. 250, 56 L.Ed. 500 (1912) (indicating that right can be waived by the voluntary absence of the defendant); *United States v. Gunter,* 631 F.2d 583, 589 (8th Cir.1980) (holding that where defendant's counsel objected to the trial judge's evidentiary rulings in evidentiary hearing, but did not

object to the defendant's absence, any claim of error due to defendant's absence had been waived); *Glouser v. United States,* 296 F.2d 853, 855 (8th Cir.1961) (recognizing that the right to be present can be waived in noncapital felony federal cases), *cert. denied,* 369 U.S. 825, 82 S.Ct. 840, 7 L.Ed.2d 789 (1962); *State v. Randle,* 603 N.W.2d 91, 93 (Iowa 1999) (noting that "[l]ike any personal constitutional guarantee, a defendant's right to be present at trial may be waived"); *State v. Hendren,* 311 N.W.2d 61 (Iowa 1981) (finding defendant waived his right to be present by voluntarily not appearing); *cf. State v. Wise,* 472 N.W.2d 278, 279 (Iowa 1991) (admonishing state district courts that barring exceptional circumstances a criminal defendant should be present "at every stage of trial, including any conversation held by the judge ... with one or more of the jurors.").

Atwood has cited no authority for his position that the trial judge had an affirmative duty to secure his presence at the meeting the trial judge had with the jury to inform it of the threat—and like Judge Zoss, this court also could not find any authority in support of Atwood's position. Had Atwood requested to be present, it is very likely that the trial court could not have denied this request—however, in the absence of a request to be present this court, without any authority so dictating, cannot say that the trial judges are the "keepers" of the criminal defendants' constitutional right to be present. The record demonstrates that Atwood was aware of the trial judge's plan to inform the jury of the threat prior to the communication actually taking place, and he and his counsel were given adequate opportunity to object to Atwood's absence at such meeting, but

has analyzed the claim for harmless error beyond a reasonable doubt in accord with

*Chapman.*

did not do so. In fact, Atwood objected, and moved for a mistrial, *only* with regard to the fact that the jury was going to be informed of the threat, and did not object to his absence at the time this information was communicated to the jury. Further, immediately following the dialogue between the trial judge and the jury, Atwood and his counsel were read the transcribed account of the trial judge's conversation with the jury. Even upon making a second motion for a mistrial following the reading of the transcribed account, neither Atwood or his trial counsel specifically objected to Atwood's absence during that conversation—rather, the argument was again focused on how knowledge that a threat had been received tarnished the jury and how not sequestering the jury would compromise the jury's impartiality beyond repair. *See* Trial Tr. at 878–81; PCR Tr. at 43 (stating that, according to trial counsel Mr. Sissel, no constitutional argument was made to the trial judge, on or off the record, of Atwood's right to be present). The court concurs with Judge Zoss's finding that Atwood likely waived his right to be present by not requesting to be present. *See Gunter*, 631 F.2d at 589 (finding that where defense counsel made no objection to the defendant's absence from an evidentiary hearing, but did expressly object to the judge's evidentiary rulings, the defendant waived his right to be present).

### b. Harmless error

In the alternative, Judge Zoss found that even if Atwood's constitutional right to be present was violated, the error was harmless under the "substantial and injurious effect or influence" standard.[10] *See* Report and Recommendation, Doc. No. 14, at 28. Atwood objects, contending that

Judge Zoss employed the wrong harmless error standard and that viewing the record as a whole, including the trial judge's apparently firm stance that he was going to speak to the jury with only the court reporter present, the defendant's absence was far from harmless.

> A review of the record reveals that [the] court's words were taken down and preserved, and defendant was allowed to make his record by motions for mistrial and for new trial. No indication whatsoever exists that had counsel and defendant been present, the trial court would have done and said anything different from what it did do and say. Nor can a sound contention be developed that what the court said was improper.

*State v. Dreessen*, 305 N.W.2d 438, 440 (Iowa 1981). Further, "[t]he communication was not an instruction on the law and had no bearing on the evidence the jurors were to consider." *State v. Williams*, 341 N.W.2d 748, 751 (Iowa 1983). In fact, it seems as though the absence of the defendant and his counsel could be seen as *beneficial*—their presence could have magnified the situation in the juror's mind, and exacerbated the effect of the information regarding the threat. *See United States v. Caldwell*, 776 F.2d 989, 997 (11th Cir.1985) (finding defendant's absence from two meetings between the trial judge and a juror, where counsel and the defendant were read transcripts of the two meetings, not violative of the defendant's due process rights and noting that defendant likely benefited from absence of himself and his counsel as their presence would very likely have had an adverse effect on juror and absence of the defendant did not affect his opportunity to defend himself). Additionally, as discussed

---

10. The court has previously overruled Atwood's objection to the use of the "substantial and injurious effect or influence" standard, rather than the harmless beyond a reasonable doubt standard for the reasons discussed *supra* section II.C.2.

above, the jury was admonished to steer clear of media coverage on the trial, and that the information they received about the threat from the trial judge was *not* evidence and was *not* to be considered in their deliberations. After the case was submitted, the jury deliberated for two days before arriving at a verdict—indicating that the jury was not compelled to rush to judgment. Any appearance of prejudice created from the absence of Atwood and his counsel is overcome by the record—which clearly indicates a lack of prejudice. *See Stewart v. Nix,* 972 F.2d 967, 971 (8th Cir.1992). Clearly, if Atwood's absence during the trial judge's communication with the jury about the threat violated Atwood's constitutional right to be present, it did *not* have a "substantial and injurious effect or influence" on the verdict. This court concurs with Judge Zoss's finding that any error that occurred was harmless, and overrules Atwood's objection.

### D. Ineffective Assistance Of Counsel

#### 1. Standards for ineffective assistance of counsel claims

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In the Report and Recommendation, Judge Zoss outlined the two-prong criteria employed in determining the effectiveness of counsel, which was enunciated by the United States Supreme Court in *Strickland.* To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate that (1) "counsel's representation fell below an objective standard of reasonableness;" and (2) "the deficient performance prejudiced the defense." *Id.* at 687, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Furnish v. United States of America,* 252 F.3d 950, 951 (8th Cir.) (stating that the two-prong test set forth in Strickland re-

quires a showing that (1) counsel was constitutionally deficient in his or her performance and (2) the deficiency materially and adversely prejudiced the outcome of the case), *cert. denied,* 534 U.S. 1031, 122 S.Ct. 570, 151 L.Ed.2d 443 (2001); *Garrett v. Dormire,* 237 F.3d 946, 950 (8th Cir. 2001). Trial counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Indeed, "counsel must exercise reasonable diligence to produce exculpatory evidence[,] and strategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." *Kenley v. Armontrout,* 937 F.2d 1298, 1304 (8th Cir.1991). However, there is a strong presumption that counsel's challenged actions or omissions were, under the circumstances, sound trial strategy. *Id.* at 689, 104 S.Ct. 2052; *Collins v. Dormire,* 240 F.3d 724, 727 (8th Cir.2001) (in determining whether counsel's performance was deficient, the court should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ...") (citing *Strickland*). With respect to the "strong presumption" afforded to counsel's performance, the Supreme Court specifically stated:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making thé evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (citations omitted).

To demonstrate that counsel's error was prejudicial, thereby satisfying the second prong of the *Strickland* test, a habeas petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The court will now turn to Judge Zoss's conclusions with respect to the ineffective assistance claim and Atwood's assertions of error followed by this court's analysis of Atwood's objections to the legal conclusions reached by Judge Zoss.

### 2. Judge Zoss's conclusions

After a thorough and comprehensive review of the postconviction relief record, the interrogatories answered by the trial judge, and the opinions of the lower courts, in addition to carefully distinguishing the authority cited by Atwood as entitling him to relief, Judge Zoss concluded that Atwood had failed to show *Strickland* prejudice:

> Accordingly, none of the cases cited by Atwood will assist the court in considering this claim for relief. Further, as was the case in Atwood's first claim of relief, he has failed to offer any evidence at all to rebut the presumption of

correctness afforded the findings of the Iowa courts, which concluded he had failed to show he was prejudiced by his counsels' alleged ineffectiveness.... [T]here is simply nothing in the record to indicate the jurors' impartiality was affected by their learning of the threatening call. Because he has failed to show prejudice, the court does not reach the question of whether Atwood's trial attorneys were ineffective.

Report and Recommendation, Doc. No. 14, at 45. As Atwood had failed to establish *Strickland* prejudice—that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052—Judge Zoss found that the ineffective assistance of counsel claim failed.

### 3. Atwood's objections

First, Atwood seemingly attacks Judge Zoss's failure to analyze the performance prong of the *Strickland* analysis. Atwood contends that his trial attorneys were ineffective for: (1) failing to request the presence of themselves and/or Atwood at the meeting in which the trial judge informed the jury of the telephone threat; and (2) failing to request individual *voir dire* of the jurors as to how they were affected by information of the threat. Atwood points to testimony of his trial attorneys that the absence of themselves and Atwood at the meeting between the trial judge and the jury was not strategy, but rather a mistake. Atwood also takes issue with the attachment of the presumption of correctness to the findings of the Iowa courts—as a reading of the record does not support the conclusion that failing to be present at the meeting was a "reasonable professional decision." In summary, Atwood argues that in light of prevailing case law, in combination with trial counsels' admissions at the postconviction relief hearing, he has

established to a preponderance of the evidence that his trial counsels' representation fell below an objective standard of reasonableness.

Second, Atwood addresses the prejudice prong, citing cases holding that knowledge of a threat can affect the partiality of the jury. Specifically, Atwood contends that "[t]elling the jury of a threat created an inference that Atwood was responsible for the threat, because no reasonable mind would believe the state was responsible for the call." Objections, Doc. No. 15, at 16. Atwood additionally asserts that "nobody protecting [his] rights was present to experience the jurors' reactions to the threat." *Id.* In conclusion, Atwood argues that these factors establish, by a preponderance of the evidence, that there is a reasonable probability the outcome of the trial would have been different but for his trial counsels' unreasonable errors.

In summary, Atwood claims that he has met both the cause and performance prongs of the *Strickland* analysis—thus establishing a claim for ineffective assistance of counsel, and entitling him to the granting of his habeas petition.

#### 4. *Analysis*

██ This court, like Judge Zoss, finds that Atwood's ineffective assistance claim can be disposed of through an analysis of the prejudice prong only—as failure to establish any one prong results in failure of the claim. *See Tokar v. Bowersox,* 198 F.3d 1039, 1046 (8th Cir.1999) ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed"), *cert. denied,* 531 U.S. 886, 121 S.Ct. 204, 148 L.Ed.2d 143 (2000). To establish *Strickland* prejudice, Atwood must demonstrate that his trial counsels' failure to secure his presence at the meeting between the trial judge and the jury and failure to request individual *voir dire* of

the jurors was prejudicial—which translates into a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

Atwood's arguments as to why he has established *Strickland* prejudice are centered squarely on the arguments he proffered in regard to jury impartiality and his absence from the meeting in which the trial judge told the jury about the threat—that prejudice is presumed to have arisen from the trial judge's *ex parte* meeting with the jury, and that his absence at the meeting was prejudicial. The court has already engaged in a lengthy discussion as to why those arguments were rejected and will not regurgitate that analysis here. Suffice it to say, the court already found that the burden was on Atwood to show actual prejudice resulting from the trial judge's communication of the nature of the phone call to the jury, and that Atwood failed to meet his burden. Insofar as Atwood contends that no reasonable mind could find that the threat came from anyone but him, the court concurs with Judge Zoss in rejecting this position:

> Atwood ignores other possible interpretations the jury could have had of the information. The threat could have come just as easily from someone close to the victims who was intent upon a guilty verdict being rendered as from someone close to Atwood with the opposite intent.

Report and Recommendation, Doc. No. 14, at 24. Further, as previously discussed, there is *nothing* to rebut the presumption that the jurors followed the court's admonishments directing them not to consider information about the threat, and to base the verdict solely on the evidence presented in the courtroom at trial. Likewise, with regard to Atwood's absence at the

meeting between the trial judge and the jury, the court has already held that any error resulting from Atwood's absence at the meeting was harmless, and therefore by definition, nonprejudicial. Atwood and his counsel were likely *disadvantaged* by their absence at the time the trial judge informed the jury of the threatening phone call, in that they could not see the nonverbal manner in which the jurors reacted to this information—but the threshold for reaching *Strickland* prejudice sits much higher than merely establishing a disadvantage; it requires that the disadvantage created a reasonable probability that the result of the trial would have been different absent that disadvantage. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. This is a threshold that Atwood has failed to meet. As Atwood offers no new arguments at this juncture to support a finding of *Strickland* prejudice, the court reaches the same conclusion as did Judge Zoss: that the Iowa courts reasonably applied the law to the facts of the case in finding Atwood had not shown he was prejudiced by his trial attorneys' performances. Atwood's objections are likewise overruled.

### III. CERTIFICATE OF APPEALABILITY

In order to appeal the denial of his federal habeas petition, Atwood must obtain a certificate of appealability from a district or circuit judge. *See* 28 U.S.C. § 2253(c). A certificate of appealability is issued only where the applicant makes a substantial showing of the denial of a constitutional right. *See Garrett v. United States,* 211 F.3d 1075, 1076–77 (8th Cir. 2000); *Mills v. Norris,* 187 F.3d 881, 882 n. 1 (8th Cir.1999); *Carter v. Hopkins,* 151 F.3d 872, 873–74 (8th Cir.1998); *Ramsey v. Bowersox,* 149 F.3d 749 (8th Cir.1998); *Cox v. Norris,* 133 F.3d 565, 569 (8th Cir. 1997), *cert. denied,* 525 U.S. 834, 119 S.Ct. 89, 142 L.Ed.2d 70 (1998). "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Cox,* 133 F.3d at 569. Like Judge Zoss, this court finds that Atwood has made the required showing and that a certificate of appealability should issue.

### IV. CONCLUSION

Atwood's objections to Judge Zoss's legal conclusions are **overruled**. The court **accepts** Judge Zoss's Report and Recommendation in its entirety. Accordingly, Atwood's petition for writ of habeas corpus is **denied**. However, a certificate of appealability **will** issue as to Atwood's claims.

**IT IS SO ORDERED.**